# Exhibit A

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TOM MESMER, on behalf of himself
and all others similarly situated,

            Plaintiff,

vs.                                    Case No: 1:26-cv-832-HYJ


STRYKER CORPORATION,

            Defendant.

_____/

STATUS CONFERENCE

BEFORE THE HONORABLE PHILLIP GREEN

U.S. MAGISTRATE JUDGE

Grand Rapids, Michigan
Monday, April 27, 2026

APPEARANCES:
For the Plaintiff:        MARK A. CIANCI, ESQUIRE
                          Israel David, LLC
                          399 Boylston Street, 6th Floor
                          Suite 23
                          Boston, Massachusetts 02116
                          (617)295-7770


                          KATHRYN E. MILZ, ESQUIRE
                          Sommers Schwartz, PC
                          One Town Square, Suite 1700
                          Southfield, Michigan 48076
                          (248)355-0300


For the Defendant:        D. ANDREW PORTINGA, ESQUIRE
                          AMY ELIZABETH MURPHY, ESQUIRE
                          Miller Johnson, PLC
                          45 Ottawa SW, Suite 1100
                          Grand Rapids, Michigan 49501-0306
                          (616)831-1700

APPEARANCES CONTINUED:

                        COLLEEN GULLIVER, ESQUIRE
                        DLA Piper LLP (NY)
                        1251 6th Avenue, 27th Floor
                        New York, New York 10020
                        (212)335-4737


Also Present:          Laci Resendiz, Stryker Corporation
                        Litigation Counsel


TRANSCRIBED BY:        Stefanie S. Pohl, CSR #5616
                        Federal Official Court Reporter
                        113 Federal Building
                        315 West Allegan Street
                        Lansing, Michigan 48933
                        (517)243-2695

*PROCEEDINGS*

THE COURT:  Good afternoon.  Please be seated.  We are here in the matter of In re:  Stryker Corporation Cyberattack Litigation, Case Number 26-cv-832.  This is consolidated cases following some sort of a breach of the -- of security at the Stryker Corporation.

Could I have appearance of counsel please.

MR. CIANCI:  Your Honor, Mark Cianci of Israel David, interim co-lead counsel on behalf the proposed class.

THE COURT:  Good afternoon, Mr. Cianci.

MS. MILZ:  Kathryn Milz on behalf of Sommers Schwartz.  I'm serving as local counsel.

THE COURT:  All right.  Good afternoon, Ms. Milz.

MR. PORTINGA:  Good afternoon, Your Honor.  Andy Portinga, Miller Johnson, on behalf of the defendants.  With me is my co-counsel, Colleen Gulliver, DLA Piper.  Your Honor, I think you know Amy Murphy, my colleague at Miller Johnson.  And also in the courtroom is Laci Resendiz from Stryker Corporation.

THE COURT:  Good afternoon to all of you.

All right.  So we're here for a status conference.  We're going to get everything decided here this afternoon, and I've reviewed the joint status report.  Thank you for that.  And I've been involved in this, at least to some extent, from the beginning.  Chief Judge Jarbou can blame me for getting all

these cases because I did the related case review.  Somehow I always manage to get assigned to that task when it comes to mammoth litigation.  Although I'm not -- I'm not so sure how complicated or mammoth this really is.  We're going to talk about that.

So as I understand it, there is a plan to file a consolidated complaint; is that right, Mr. Cianci?

MR. CIANCI:  That's correct, Your Honor.

THE COURT:  And that is going to be filed by May 8th?

MR. CIANCI:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Portinga, why does Stryker need 60 days to respond?

MR. PORTINGA:  Well, first of all, we don't have the consolidated complaint yet, so we don't know exactly what the allegations are.

THE COURT:  Well, you have a pretty good idea, don't you?

MR. PORTINGA:  Yeah, we do, Your Honor.

But we also have some travel plans coming up so that is one of the reasons why we're --

THE COURT:  Travel plans.

MR. PORTINGA:  Not myself; I'm not going anywhere fun. There -- that is a factor in our statement, Your Honor.

THE COURT:  All right.  Well, I want to be fair here, but I don't know what travel plans means.  Could be anything.

And I know all you lawyers, and I know you're honorable people, but 60 days is not -- not going to fly, so. And everybody -- I think the lawyers on one of the side of the courtroom know Judge Jarbou. I'm not sure, Mr. Cianci and Ms. Milz, how well you may know Chief Judge Jarbou. There is no judge that works harder than she does, without question. There is no judge who moves her cases more efficiently, and she expects everybody else to do the same.

So if -- if you were hoping for a judge who would be amenable to extending things out, you found -- you're out of luck. This is not the judge who's going to do it. I'm also not the judge who's going to do it, but ultimately it's -- it's her call. She and I have had a conversation just generally about these cases. She's never told me what to do, and she hasn't told me here what to do, but I know her well, and I know what she expects. And for what it's worth, I share her view.

So I'm not unwilling -- normally there's 21 days to file a response. Stryker is certainly a litigant with significant resources when it comes to attorneys, but I -- but I don't want to be arbitrary. So, Mr. Portinga, maybe you can make a more specific pitch as to what you need.

MR. PORTINGA: The specific pitch is that Ms. Gulliver, who's -- in her case she's taking the lead on the motion to dismiss, she's going to be traveling out of the country from June 4th to the 12th. We would like to avoid

having anything done -- or due during that time period.

THE COURT:  Okay.  June 4th.  So she's back the 12th?

MR. PORTINGA:  Correct.  Yup.

THE COURT:  Well, I mean, the 21 days, it would elapse before she even leaves to go out of the country.  So help me understand how being out of the country after June 4th -- you want to defend yourself, go ahead.

MS. GULLIVER:  Thank you, Your Honor.  So in my experience, and Mr. Cianci can answer this better, but it's not uncommon to see in a consolidated amended complaint that certain plaintiffs that were named originally are no longer there and other named plaintiffs are added, so we don't really know until the operative complaint is filed on May 8th which individuals might be plaintiffs, and so that's part of it.  We will need time.  We can't assume it's the same individuals.

And then --

THE COURT:  Agreed.  But why does that matter?  If you're filing a motion to dismiss, tell me -- tell me what you anticipate the bases for a motion to dismiss to be.

MS. GULLIVER:  In these types of cases there's usually a couple -- there would be regular failure to state a claim arguments, but we would also want to explore whether there's an opportunity to do an Article III Challenge to Standing, which does depend on the specific individual at issue, and so we can't even begin to investigate that possibility --

THE COURT: What categories does -- do these plaintiffs fall into?

MS. GULLIVER: These are employees at least currently, Your Honor.

THE COURT: Okay. So how would you distinguish one from another with respect to standing?

MS. GULLIVER: Depending on their time of employment, the type of information the company might have, all of those things could matter.

THE COURT: Well, if personal information that's stored at the company that's been breached, why would it matter when the employee worked there?

MS. GULLIVER: Because the employer might not have that information. It might have been lost by the time of the breach and there's also an open question, Your Honor, based on the complaints whether there has been data that has been breached, which I know Mr. Portinga's going to talk about in regards to our request about discovery, but this is still a very new, live incident, and so exactly what is at issue here isn't fully determined.

THE COURT: Well, I -- I'm trying to contemplate and see how this is going to play -- how many -- there are hundreds of plaintiffs here. You're not -- is it all together -- was it six cases, how many total plaintiffs are there?

MR. CIANCI: Your Honor, I believe there are currently

six named plaintiffs.

THE COURT:  Six named plaintiffs.  All right.  These are punitive class actions.  Okay.  So you know who the named plaintiffs are.  I think you could have -- I'm not telling you how to do your job, but I think if I were representing Stryker I'd check all six of them to see if they have standing so that I could be ready to respond to a consolidated complaint.

Do you anticipate adding a new named plaintiff to a -- to the consolidated complaint?

MR. CIANCI:  Your Honor, standing here as of this moment and having looked at a draft consolidated amended complaint as of last night, no.  That doesn't mean that something may not --

THE COURT:  You sounded a little like a politician, but I -- I understand.  I'm not criticizing you; I understand.  You don't want to commit yourself to anything at this point.

I mean, it seems to me unlikely that we're going to have a significant change in the named plaintiffs here, and we're talking about six plaintiffs -- I mean, potentially if the classes are certified, we're talking about a large number of people, but -- but we're looking at six plaintiffs.

I mean, based on what I know now, I'm not prepared to give you 60 days.  I don't want you to miss your trip to Europe.  I made a trip to Europe in February, and I wouldn't have wanted to miss that, so I'm -- I don't want to be

completely heartless, but I -- but I can't -- I can't go 60 days. And the problem with going with a little more than 21 days I'm not sure it helps you if the deadline falls between June 4th and June 12th.

MR. CIANCI: At the risk of bidding against ourselves, can we at least get 45, Your Honor?

THE COURT: I am willing to consider giving you more than the 21, Mr. Portinga, but I was hesitant because I thought I may not be doing you any favor if the new deadline is when Ms. Gulliver is in -- in Europe. How would 30 days work for you?

MR. PORTINGA: So if -- if the plaintiffs file on May 8th, that would put us on June 7th, which I think is when you're gone, right? So we -- frankly, I mean, we'd rather --

THE COURT: She's leaving on the 4th.

MR. PORTINGA: The 4th, right.

THE COURT: So, Ms. Gulliver, you must be a very valuable lawyer. You know, I've seen three other lawyers on your side, all very good lawyers, so I'm having a little hard time understanding why you're the only one that can do this. I'm not interested in interfering with a client's, you know, decision about what lawyer they want to do what. I'd like to accommodate you to the extent I can. Okay. 45 days.

MR. PORTINGA: Thank you, Your Honor.

MS. GULLIVER: Thank you, Your Honor.

THE COURT: Send me a postcard, Ms. Gulliver. No, I'm kidding. I'm kidding.

All right. So we have 45 days to respond to the consolidated complaint and then plaintiffs -- why do you need 45 days?

MR. CIANCI: Your Honor --

THE COURT: I'm assuming they're going to respond to the complaint by filing a motion to dismiss and that would be the only reason you need to respond. If they answer, there is no response to that.

So assuming they file a motion to dismiss, what is it about this case that would warrant additional time to respond? Because you would normally get 21 days.

MR. CIANCI: Yes, Your Honor. And part of the --

THE COURT: Don't tell me you're going to Europe.

MR. CIANCI: No, I wish. No, I am not.

THE COURT: Okay.

MR. CIANCI: No, part of the genesis behind the initial suggestion was some semblance of parody.

THE COURT: Yeah, that's what it looks like. We're giving you more time, so you're going to give us more time. And I'm stingy; I'm not giving you more time. Okay? I reluctantly gave plaintiffs [sic] a little more time because I think going to -- a pre-planned trip to Europe is legitimate, and I don't want to be the one to interfere with a pre-planned

trip to Europe. Otherwise I wouldn't have given them more time. So you'll have 28 days --

MR. CIANCI: Thank you, Your Honor.

THE COURT: -- to respond. And then Stryker will have 14 days to reply.

All right. The next thing on the agenda here, I understand, Mr. Portinga, would you like to address the issue of discovery?

MR. PORTINGA: I would, Your Honor. As you know, from our -- and I can probably walk to the podium.

THE COURT: Whatever's convenient. I don't care where -- where you stand, Mr. Portinga.

MR. PORTINGA: I think you saw in our joint status report, our position is that we should not be proceeding with discovery at this point and really shouldn't be issuing a scheduling order at this point.

There's two things that I really want to impress upon the Court here. The first is the recency of the events. Okay? This occurred on March 11th, a little over a month ago. All right? The first complaint was filed on March 13th, two days later and then in the next week we had four more complaints and then a couple more in the weeks after that.

This is a situation where things are still developing. Right? I mean, this is sort of like, you know, we had a house fire and the embers are still warm. Right? There's a lot that

is still being investigated and there's a lot that still remains to be done.  So because of the recency of the events, we think it's inappropriate to go forward with discovery here.

The second reason is, this is not your typical data breach case or cyberattack case.  I mean, this is not a 13-year-old kid sitting in somebody's basement who hacked, you know, a database somewhere.  This was an act of a group associated with the nation at which we are currently at war.  Right?  This was a state sponsored activity.  Why they targeted Stryker, that's a great question.  Right?  I mean, the screen that they put on social media said something about Stryker being a Zionist-backed organization, which doesn't really make any sense, and you sort of wonder whether they actually know that Stryker makes hospital beds and not attack vehicles.

You know, this was an act of the nation state organization associated with a nation state at a time of war, and the FBI is very involved with this, the White House is very involved with this and because of that aspect of it, we think it is inappropriate to have plaintiffs be doing discovery when law enforcement and national security agencies and national security affiliated organizations are doing their work.

So that's why we think that the -- any discovery ought to be paused.

THE COURT:  Well, surely you're not suggesting discovery would be paused pending the completion of the

government's investigation?  It could be years.

MR. PORTINGA:  It could be, Your Honor, but certainly --

THE COURT:  That's not going to happen.

MR. PORTINGA:  Understood.

THE COURT:  That's not going to happen.

MR. PORTINGA:  No.  But certainly there's no need to rush into this when it's only I think, what, six weeks ago that it actually happened.

THE COURT:  Okay.  So -- I mean, my house burned six weeks ago, why do I need to extend -- put off discovery?  I mean, you produce the discovery, what you know, what you have, and I would anticipate in this case that discovery would -- would involve supplementation as you go along.  It may, in fact, be -- turn out to be to plaintiff's disadvantage to conduct discovery earlier because to the extent information is not known then they, in fact, may be at a disadvantage.

MR. PORTINGA:  It is certainly their burden of proof and not ours.  I understand that.

THE COURT:  Yeah.

MR. PORTINGA:  But we do have a situation here where it's more than just a company that was targeted by some group. We see -- we see these cases all the time, I know the Court does.

THE COURT:  Uh-huh.

MR. PORTINGA:  But this one is different because of the geopolitical aspect on this and because of the involvement in the --

THE COURT:  Well, Iran is never going to cooperate.

MR. PORTINGA:  I -- I --

THE COURT:  It's not like we're waiting for the war to end and then we're going to have all this cooperation.  So I get that this is -- apparently involves a foreign power, you know, with whom we are at war.  I don't know what being at war with -- with Iran has to do with putting off discovery because it's not like once the war is over everything is going to be fine.

MR. PORTINGA:  I think, frankly, Your Honor, it's a matter of letting the federal government do their work, for getting --

THE COURT:  Then we're back to years, you know.  And I do have some familiarity with how quickly the federal government conducts investigations, and my fear would be that by the time they're finished none of the plaintiffs would remember what happened.

Okay.  Thank you, Mr. Portinga.  I'll hear from Mr. -- I guess Mr. Cianci.

MR. CIANCI:  Yes, Your Honor. We strongly object to delaying, staying or postponing discovery in this case.  The law is clear that notwithstanding the forthcoming motion to

dismiss from Stryker, a forthcoming or even pending motion to dismiss does not justify staying discovery and --

THE COURT:  Well, I'm not hearing Mr. Portinga say that's the reason.  It sounds to me like he's saying -- and there are legitimate concerns.  I'm not making fun of anything that Stryker is saying here.  I'm not belittling or minimizing it.  These are real concerns.  These are real complications, and as I said, I suspect it -- it may inert to your detriment to the extent you're trying to do discovery at the same time the federal government is conducting an investigation.

Not only do they tend to take forever, they're not good at sharing.  Okay?  You understand that, right?  The federal government is not knowing being liberal in its willingness to share information it gathers during the course of its investigation.  You may find yourself thwarted over and over again because you're trying to get information, the federal government says, you're not going to get this.

MR. CIANCI:  Understood, Your Honor.

THE COURT:  Do you understand?

MR. CIANCI:  Absolutely, Your Honor.  And to the extent defendants are not using the motion to dismiss as a basis to avoid discovery, with that, I definitely agree.

With respect to the ongoing investigation, a couple important points there.  First of all, the fact that Stryker is currently in the process of fact development, fact finding,

investigating and otherwise understanding the root cause of the incident here, that actually weighs against staying discovery as opposed to in favor it for the very reason that usually when defendants are seeking to stay discovery, they talk about the burden, the expense imposed by such fact finding.  Here Stryker is going to do that work anyway, and so to give plaintiffs access to the underlying facts and to any nonprivileged reports that are generated in the course of this investigation is abundantly appropriate.

We've already heard additionally, Your Honor, that the judges overseeing this matter require us to be moving at an appropriate pace, and given the fact that we essentially have a choice to wait for the government investigation, which could take years to conclude, or begin discovery at a customary, appropriate timetable, I think avoid --

THE COURT:  What is the appropriate timetable here?  I mean, we don't -- we don't even have the consolidated complaint let alone a response filed to it, so there's -- there's no discovery at this point, but what would you anticipate being -- the time to begin discovery?  Are you -- are you advocating for Rule 26(f) conference to take place in the normal case?

MR. CIANCI:  Yes, Your Honor.

THE COURT:  And what would you anticipate at this point the areas of discovery?

MR. CIANCI:  Within the document discovery universe,

we would certainly want to understand documents regarding Stryker's security -- security policies and procedures, its IT processes designed to avoid cyberattacks.  Yes, based on public reports, this was a cyberattack by a state actor, but the methodologies that state-sponsored cyberattackers use are not fundamentally different from other methodologies, so we'd just like to understand what Stryker had in place to avoid this sort of attack.

Then secondarily, we'd like to understand the documents supporting the narrative around how the breach occurred.  Yes, again, we have a general understanding that it was carried out by certain agents, but we want to understand what --

THE COURT:  And these agents were overseas?

MR. CIANCI:  Apparently, based on public reports. We've seen no documents, but we would like the documents regarding how the breach occurred.

Then, third, we would like the documents regarding what steps Stryker took in response to the breach both to correct or terminate the breach as well as, fourth, what documents Stryker -- the documents that show what steps Stryker is taking to avoid such a breach occurring in the future.  We have, at least in the complaint that I filed and I anticipate in the consolidated amended complaint, request for injunctive relief because to the extent the plaintiffs --

THE COURT: You want to enjoin what's already happened?

MR. CIANCI: Well, we would like to -- not to enjoin with what has already happened, Your Honor, but we would like Stryker to improve its processes and procedures to prevent something like this happening -- happening again.

THE COURT: Is this a preliminary injunction or are you talking about an ultimate --

MR. CIANCI: I'm talking about why we want to see documents regarding what Stryker has done to prevent this from happening again because to the extent Stryker's self-directed remedial measures would prevent something like this from happening again, then the Court may decide or we may decide as plaintiffs that no further judicial intervention is required.

So at a documentary level, that is a high level overview of what we would seek in discovery. Naturally, there would be written discovery, depositions and the like, but all going to those same core set of issues I would currently anticipate.

THE COURT: All right. Thank you.

Mr. Portinga, unfortunately, I'm a Luddite, and I remain convinced that computers, like television, are a passing fad, not worth consideration. I say that half facetiously. Help me understand -- I don't have the first concept of hacking a computer, how one would do it. I can't even picture it in my

mind. Help me as best you can, knowing my limitations, to understand how these foreign actors would have operated significantly different from other -- their motive might be different, but help me understand how -- how the fact that these were apparently Iranians, how that complicates the process of determining how the hacking occurred.

MR. PORTINGA: Now, all of these issues raised by the plaintiff here about how this happened and how it got responded to, these all implicate national security issues. Okay? How did the Iranians get into this big, multi-national company? I don't know all the details of that. I have a very, very, high level aspect of it, but this is a situation where I think the Court has to be concerned if we start doing discovery on this, right, and then are we -- are we given a road map to somebody else to do this to somebody else, and somebody that is actually involved in defense as opposed to somebody that makes hospital beds, and that's Stryker.

So I think that's one of the issues that needs to be considered here when we're talking about discovery here. And before we go down that road of, you know, what happened, how it happened, how it got responded to, we first ought to be talking about did the plaintiffs here actually have standing because it's not at all clear that even if -- for these six named plaintiffs there was personally identifying information that was there, we don't know for sure what that -- what the answer

to that is.  Even if we were to assume that that information was accessed by the hackers, and we don't know the answer to that either, you've still got to prove damage, got to have injury to have standing, and the fact that somebody looked at your social security number online doesn't give you standing. That's not actual damage.  Right?  So a big issue here is whether these named plaintiffs have standing of actual injury. And before we go down the -- down the road of all these issues that really implicate some really big problems, we ought to be focused on that first.

So our view, frankly, Your Honor, is, let's not schedule this case until at least after we -- we file our motion to dismiss, but if we're going to do any discovery, let's limit this discovery to the standing issue first before we start going down the road on other issues.

MR. CIANCI:  Your Honor, first, on the supposed road map, first of all, any information regarding --

THE COURT:  I think it was a proposed road map, not a supposed road map.

MR. CIANCI:  Understood, Your Honor.  I don't think that any information that is developed in discovery would ever be shared outside the confines of this litigation.  Certainly, first of all, none of the information that is transmitted from defendants to plaintiffs in the litigation process is going to be publicly filed in the first instance.

Secondly --

THE COURT:  Are you suggesting there would be a protective order here?

MR. CIANCI:  A hundred percent, Your Honor.  And to that point, to the extent any of those very fine details need to be filed, they could be filed under seal pursuant to that same protective order.  So I don't think there's any road map --

THE COURT:  We don't like sealing things, Mr. Cianci.  I don't know if you're familiar with -- something else that Judge Jarbou and I share is a distaste for sealing documents.  Not to say it can't be done.

THE COURT:  Understood.

THE COURT:  We don't do it very readily.

MR. CIANCI:  Understood.  I think between sealing small portions of the record and avoiding the development of a record entirely --

THE COURT:  Again, I can't help but go back to -- I mean, I have some experience with the FBI.  They don't like sharing, and I'm not -- I can't predict what will happen here, but I would not be the least bit surprised if at some point the FBI steps in and says, wait a second, you guys are interfering with a -- with an investigation that addresses national security interest.  I -- I don't know.

In a former life, I used to go around the country

putting a stop to things on behalf of the FBI.  I was never very popular in doing that, I can recall.

So, again, I can't pre-judge this, and I can't know what -- well, any of the government agencies it may involve -- be involved in this, and there will be a number of them -- what they may do.  I'm just anticipating -- I would not be the least bit surprised if the government at some point is putting up road blocks in some way, shape or form.

MR. CIANCI:  Appreciate that, Your Honor.  And certainly our position is that we shouldn't be preemptively or proactively trying to circumscribe discovery before hearing such concerns.  As the plaintiffs, we're certainly aligned with the interests of the defendants.  We don't want any national security risks to emerge, and we would take every possible precaution --

THE COURT:  Uh-huh.

MR. CIANCI:  -- to avoid that.  But at this point that's more of a potential, and we haven't heard any concrete interest by any -- there are no national security agencies in this courtroom, Your Honor, and so we think --

THE COURT:  Well, not yet.

MR. CIANCI:  Agreed, Your Honor.  And so --

THE COURT:  And maybe never.  I'm not saying it won't happen.  It may simply be you're thwarted from getting certain information.  I mean, the -- you know, I don't imagine that

Kash Patel is going to sit down for a deposition, but I don't -- but I also don't know that they're going to come in affirmatively and try to intervene in any way, shape or form.

MR. CIANCI:  Agreed, Your Honor, and I think a lot of what this focus is on is potential third-party discovery, so am I going to be sending out a subpoena to the FBI?  That might --

THE COURT:  Read up on the Touhy regulations before you do that.

MR. CIANCI:  Exactly.  Exactly.  But as far as party discovery, I don't think these potential --

THE COURT:  Yeah.

MR. CIANCI:  -- national security interests rise to that same level.

One final point with respect to the proposed one-way discovery plaintiff's standing.  We don't think that's appropriate, Your Honor.  The discovery under the rules by default is a two-way --

THE COURT:  Well, that wouldn't be one-way necessarily.  To limit discovery initially to standing would be a two-way discovery.  That would be -- you would be allowed to -- you know, to engage in discovery to determine whether there's evidence to support the standing of your client.

MR. CIANCI:  Yes, Your Honor.  I guess what I meant by one-way is designed only for purposes of one defense that has been interjected by --

THE COURT: Well, it would be a bifurcated discovery. That -- there's nothing particularly unusual about the Court taking discovery in that. And I'm not saying we're going to do that but there's nothing particularly unusual about that.

MR. CIANCI: I guess my only point is the -- the national security interests that have been raised by defendants here, they don't really lend themselves to that sort of bifurcated process. And you could, in theory, impose that bifurcated process in every single data breach.

THE COURT: Well, I -- I agree with you that I -- if I understand what you're saying, that the potential national security interests here are not relevant necessarily to the issue of standing. I don't hear Mr. Portinga to be arguing that. I -- in fact, what I understood him to say is -- to suggest that if we're doing any discovery, we would at least begin there where I would think it least likely would implicate national security.

I'm not here to -- I don't work for the FBI any more. I don't work for the Department of Justice any more. So I'm not here advocating on behalf of the federal government. It can take care of itself. I'm here to help manage this case, to move it along as expeditiously as we can. I'm trying to find a way that -- to do that without unnecessarily creating problems.

So let me -- Mr. Portinga, any last thoughts before I share my plan here?

MR. PORTINGA:  No, Your Honor.  Thank you.

THE COURT:  Okay.  At this juncture there is no motion to stay discovery.  So that -- that issue is not properly before the Court, much less have I been authorized by Judge Jarbou to address that issue.  I stay in my lane, okay?  I only can do things what Judge Jarbou refers to me.  I suspect that if that motion is filed, it will be referred to me, but we don't know that.

I -- I will tell the parties -- I don't often offer opinions ahead of time.  I -- I would suggest to Stryker that it think long and hard before filing a motion to stay discovery.  I think it not likely to be granted.  I think the Court may entertain a bifurcation of discovery, at least initially.  But we're not there yet, and my suggestion is -- and I'm not telling anybody what to do; you can file -- whatever motions you think is in your client's best interest, you file them, regardless of anything you hear from me, and the Court will address them in due course.

I -- I just know Judge Jarbou really well, and I know that of all the judges, she's the least likely to grant a stay of discovery.  I'm the second least likely.  So keep that in mind for what it's worth.

But let's do this:  Let's proceed with the filing of the consolidated complaint and the response to the consolidated complaint, which I'm assuming is going to be a motion to

dismiss, and we'll see what all issues are in that motion to dismiss.

Once that is filed, I think we're going to be in a better position to determine what the next steps will be.  So what I would like to do in anticipation of that is to go ahead and set a status conference for shortly after the filing.  Even before you respond to the -- the motion to dismiss I think we can have a status conference because we're all going to at least know, these are the issues in the motion to dismiss and that way we can have a better idea of how to proceed from that point on and whether it would be limiting initial discovery to standing, I don't know, but at least the Court would be willing to consider that, as long as we're moving the case along.  Okay?

All right.  So if the -- we're talking about 45 days after May 8th.  Can somebody help me on giving a date?  What is the 45 days after May 8th?

MS. GULLIVER:  We believe it's June 29th, Your Honor.

THE COURT:  June 29th?

MS. GULLIVER:  Uh-huh.

THE COURT:  Okay.  Thank you.  So I have some availability the second week in July, on the 8th or 9th.  If you guys could look at your schedules, let me know if you have either a conflict with either of those dates or a preference as to either of those dates.

MR. PORTINGA:  I think we're good.  Your Honor, the defendant's side is good for those dates.

THE COURT:  I'm sorry?

MR. PORTINGA:  We're good for those days.

THE COURT:  Either day?

MR. PORTINGA:  Yeah.

THE COURT:  Okay.  Mr. Cianci?

MR. CIANCI:  Your Honor, I turned my phone off, but my best recollection is --

THE COURT:  Well, we can wait.  You can turn your phone on.  I'd rather make sure we have a good date now than have to change it.

MR. CIANCI:  Yes, Your Honor, I'm --

THE COURT:  Either day?

MR. CIANCI:  -- I'm generally available.

THE COURT:  Okay.  Why don't we say the 8th.  How about 2:00 like we did today?

Mr. Cianci, are you coming from out of town?

MR. CIANCI:  I am, Your Honor, but that works.

THE COURT:  Okay.  Ms. Milz, are you local?

MS. MILZ:  I'm from Southfield.

THE COURT:  Southfield.  Local enough.

MS. MILZ:  Local enough.

THE COURT:  In the state anyway.

MS. MILZ:  Yup.

THE COURT:  Okay.

MS. GULLIVER:  Your Honor, we just wanted to note -- this is why we're lawyers and not math people.  We think our response to --

THE COURT:  This is why we're lawyers and not people, is that what you said?

MS. GULLIVER:  Not mathematicians.  We think our response is due June 22nd, a week earlier.

THE COURT:  Oh, thank you.  That's fine.  I think -- okay.  So let's see.  Probably just going to leave -- let's see.  I think we'll leave -- we'll still keep it on the 8th. Yeah.  Thank you for --

MR. PORTINGA:  And I'm sorry, Your Honor.  What time did you say?

THE COURT:  2:00.

MR. PORTINGA:  2:00.

THE COURT:  The same time we did today.

All right.  Is there anything else that would be useful to discuss at this point?

Mr. Cianci?

MR. CIANCI:  No, Your Honor.

THE COURT:  Mr. Portinga?

MR. PORTINGA:  No.  Thank you, Your Honor.

THE COURT:  All right.  Thank you, counsel.

MS. GULLIVER:  Thank you, Your Honor.

MS. MILZ:  Thank you, Your Honor.

*(Proceedings concluded at 2:35 p.m.)*

C E R T I F I C A T E

I certify that the foregoing is a transcript from the Liberty Court Recording System digital recording of the proceedings in the above-entitled matter to the best of my ability.

/s/   Stefanie S. Pohl
Stefanie S. Pohl, CSR #5616
U.S. District Court Reporter
Lansing, Michigan 48933
(517)243-2695